William E. WESTWOOD, Plaintiff,

v.

Edwin A. COHEN, Barr Laboratories, Inc. and Louis J. Guerci, Defendants.

No. 92 Civ. 4406(VLB).

United States District Court, S.D. New York.

Nov. 17, 1993.

---

Jay K. Kupietzky, Sol Schreiber, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, Sherrie R. Savett, Todd S. Collins, Berger & Montague, P.C., Philadelphia, PA, for plaintiff.

Robert S. Fischler, Winston & Strawn, New York City, Scott Szala, Winston & Strawn, Chicago, IL, for defendants Barr Laboratories and Cohen.

Mark R. Kook, James Shanman, Sharfman, Shanman, Poret & Seviglia, P.C., New York City, for defendant Guerci.

### MEMORANDUM DECISION

VINCENT L. BRODERICK, District Judge.

### I

This is a securities fraud class action filed against Barr Laboratories, Inc. ("Barr") and officers of Barr (collectively, the "defendants") based on alleged deficiencies in disclosures to the public related to testing procedures concerning certain generic pharmaceutical products. The plaintiff claims that a decline of Barr's stock price was artificially delayed between October 24, 1991 and February 4, 1993, the class period.

The case is brought under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); Rule 10–b–5 promulgated under it, 17 CFR § 240.10–b–5; and Section 20 of the Exchange Act, 15 U.S.C. § 78t. By order dated February 10, 1993, I granted the plaintiff leave to file an amended complaint under Fed.R.Civ.P. 15(a), see *Jacobson v. Cohen*, 146 F.R.D. 95 (S.D.N.Y.1993), which I now accept as "the complaint".[1]

The defendants have moved to dismiss the complaint as supplemental under Fed. R.Civ.P. 15(d), or in the alternative for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6) and for failure to allege fraud with particularity as required by Fed.R.Civ.P. 9(b).

I deny the motion to dismiss the complaint without accepting as actionable some of the legal conclusions or categorizations contained within it. See *Peckham Materials Corp v. Raima*, 821 F.Supp. 123 (S.D.N.Y.1993).

A complaint that survives dismissal at this stage of the litigation still faces additional hurdles, inasmuch as many of it allegations would be insufficient if standing alone. As the United States Supreme Court stated in *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974):

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence ..., its task is necessarily a limited one. The issue is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

### II

The complaint alleges that Barr and its officers misled securities buyers and holders as to the seriousness of misconduct uncovered by the Food and Drug Administration concerning testing and consequent labelling of various generic pharmaceutical products.

Generic products serve an important function in the economy by providing consumers with means of purchasing goods without be-

---

1. Plaintiffs sought leave of court to file an amended complaint after a decision adverse to Barr in part was rendered in an action brought against Barr by the Food and Drug Administration, *United States v. Barr Laboratories, Inc.*, 812 F.Supp. 458 (D.N.J.1993).

ing required to pay for expensive promotion of brand names which carry higher prestige and recognition. At the same time, generic manufacturers and distributors,[2] like any other vendors, at times engage in misleading behavior including erroneously indicating that their products are equivalent to promoted brands when this is not necessarily the case.

The function of generics in disciplining the market and avoiding price escalation detrimental to the public,[3] is balanced by the fact that almost by definition generic products are copies of other wares and not innovative.[4] In the case of the pharmaceutical industry, complaints about high consumer prices for some promoted brands led to state laws requiring pharmacists to substitute generics unless otherwise directed by prescribing physicians, and to regulatory support for greater availability of generic pharmaceuticals.[5]

In 1984, Congress recognized the importance of both pioneer/promoted brand and generic pharmaceuticals in the Drug Price Competition and Patent Restoration Act, Pub Law 98–417, 98 Stat 1585. See generally Wheaton, *Generic Competition and Pharmaceutical Innovation: The Drug Price Competition and Patent Term Restoration Act of 1984,* 34 Cath U L Rev 433 (1986). This statute, known as the Waxman–Hatch Act after its bipartisan sponsors, permits pioneering pharmaceutical patentees to obtain restoration of patent life lost during regulatory evaluation of new preparations. The Act also exempts generic producers from the need to repeat expensive human and other testing of pharmaceuticals where they are shown to be effectively the same as previously approved pioneer brands. In the latter respect, the Act codified and extended *Burroughs Wellcome Co. v. Schweiker,* 649 F.2d 221 (4th Cir.1981), which had held that generic producers could rely on published scientific literature to support new drug applications without repeating tests described in such literature.

Where differences in inactive ingredients which serve to dilute or carry active medicinal ingredients in a preparation differ from those in a previously tested product, reliable evidence in some form of safety and efficacy is required. *United States v. Generix Drug Corp.,* 460 U.S. 453, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983). This is recognized as important by the generic industry; without such a requirement, the need for governmental approval could not be cited as evidence of the safety and efficacy of the generic products.

The Waxman–Hatch Act was abused by some generic manufacturers who claimed that a preparation was proven identical to a previously approved pioneer brand when this was not the case and failed to take other required precautions. This short-circuited the requirement for testing or scientific literature support for the safety and efficacy of the actual preparation sold. Such charges and accusations of corruption involving some generic industry members and staff of the Food and Drug Administration surfaced in a congressional investigation in the late 1980's

**2.** In some instances, the same makers produce both promoted brand and generic versions of the identical product under different labels, just as they may produce so-called "house brands" consisting of identical products carrying the label of the buyer or distributor.

**3.** See J. Palamountain, *The Politics of Distribution* (1955).

**4.** Both protection of innovation and promotion of price competition are vital to a functioning open economy, as recognized by the balanced texture of intellectual property statutes and their interpretation by the courts. See *Feist Publications v. Rural Telephone Service Co.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (O'Connor, J. for unanimous Court); *Bonito Boats v. Thunder Craft Boats,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (O'Connor, J.); Merges & Nelson, *On the Complex Economics of Patent Scope,* 90 Colum L Rev 839 (May 1990); Raskind, *The Misappropriation Doctrine as a Competitive Norm for Intellectual Property Law,* 75 Minn L Rev 875 (Feb 1991).

**5.** See generally Hecht, *Generic Drugs: How Good Are They?,* FDA Consumer Magazine, Feb 1978 at 17–18; US Dep't of Health, Education & Welfare, *Final Report, Task Force on Prescription Drugs* (Feb 7, 1969); Warner, *Consumer Protection and Prescription Drugs: The Generic Drug Substitution Laws,* 67 Ky L J 384 (1978–79). The New York substitution law was upheld in *Pharmaceutical Society of the State of New York v. Lefkowitz,* 586 F.2d 953 (2d Cir.1978).

and received substantial public notice through widespread press coverage.

### III

The essence of the present complaint is that Barr and its defendant officers disseminated false and misleading information about a Food and Drug Administration ("FDA") investigation, fraudulently concealed inadequate testing procedures concerning pharmaceuticals, and omitted material information from Securities Exchange Commission ("SEC") filings, news reports and public statements.

Plaintiff purchased 100 shares of Barr common stock on November 11, 1991 for $21.75 per share. Defendant Edwin Cohen ("Cohen") was President and Chief Executive Officer and a director of Barr until January 1993, when he became Chairman of the Board. Louis J. Guerci ("Guerci") was Vice–President for Finance and Chief Financial Officer of Barr until he left the company in or about June 1992.

The complaint alleges a course of conduct beginning on October 24, 1991 and continuing through February 4, 1993 (the class period), including the following:

Some six weeks before the beginning of the proposed class period, Barr announced that net earnings for the fiscal year ending June 30, 1991 had increased 320 percent over the previous fiscal year. At that time, September 11, 1991, Cohen indicated that he was "optimistic" that some of Barr's 80 new drug applications then pending would be approved in the coming year.

On October 24, Barr announced that the FDA had recently completed inspections of Barr's Northvale (NJ) and Pomona (NY) facilities and concluded that Barr might be in violation of certain Current Good Manufacturing Practices.[6] Barr's public response to the FDA inquiry included statements that "Barr's commitment to the manufacture of high quality generic pharmaceuticals" remains "strong" and that many FDA observations were "trivial in nature and could be considered subjective and retaliatory."[7] Barr also stated that the FDA inspection "uncovered no incidence of fraud, misrepresentation, deception or other similar acts" (complaint ¶¶ 30, 31).

■ On November 7, 1991 the *Wall Street Journal* (at A11A) reported that the FDA had presented Barr with a proposed consent decree requesting that Barr cease manufacturing and distribution until certain regulatory issues were resolved and that the company declined to sign the decree. Guerci was quoted as stating that "There is no question as to the safety or efficacy of any of our products." He also reported that Barr hoped that the outstanding difficulties with the FDA could be resolved amicably (id. ¶ 33) but he also indicated that the issue "may wind up in court."[8]

Four days later, Guerci made statements reported in the financial press, including the Dow Jones News Wire, minimizing the possibility of critical safety problems and claiming that the FDA sought to close down Barr's manufacturing facilities due to "a whole series of very technical issues" relating to Current Good Manufacturing Practices. Although not set forth in the complaint, the full

---

**6.** The FDA's investigation is set forth in greater detail in *United States v. Barr Laboratories, Inc.,* 812 F.Supp. 458 (D.N.J.1993).

**7.** The plaintiff also quotes a press release issued on June 15, 1991 stating that the FDA's allegations were "consistent with the agency's pattern of retaliation against the company which testified against the agency in Congress in 1989" (complaint ¶ 46).

**8.** Plaintiff's complaint did not include this sentence, but it and other portions of the *Wall Street Journal* article, as well as parts of other documents introduced in the complaint, may be relied upon in considering the motion to dismiss now before me without converting a Fed.R.Civ.P.

12(b)(6) motion into a motion for summary judgment pursuant to Fed.R.Civ.P. 56 because such documents "were available to and clearly known of" by the plaintiff. *Robbins v. Moore Medical Corp.,* 788 F.Supp. 179, 185 n. 3 (S.D.N.Y.1992); see *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied* — U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); Fed.R.Civ.P. 10(c); Fed.R.Evid. 106: "When a writing ... or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

text of the Dow Jones story indicates that the article also pointed out that Barr stock "nosedived" as a result of the concerns about the ongoing dispute between Barr and the FDA.

On November 26, Barr initiated a recall of 335 bottles of a liquid antibiotic due to misla-

beling. Plaintiff claims that by announcing that only 335 of 26,250 bottles shipped at that time were mislabeled, the company misrepresented the magnitude of the testing problems at the laboratories (id. ¶ 37).

Barr's stock price dropped during this period as follows:

| | |
|---|---|
| October 24, 1991 | $27–⅞ [9] |
| November 7 | $26–¼ |
| November 11 | $23–¼ |
| November 27 | $15–¼ |
| November 29 | $13. |

---

The stock climbed to a high of $22⅝ in late March 1992 and then began declining again, falling from $17⅝ on April 20 to $14¾ on April 21, 1992, apparently in reaction to a securities analyst's statement that it was too early to predict how long it would take to resolve Barr's dispute with the FDA.

On April 27, 1992 Barr announced that it had filed suit against the FDA to stop the agency from enforcing an "Alert List" against some of the company's products. Barr President and CEO Cohen stated that he did not think that the FDA inspection raised "serious issues". Two days later Barr announced that it was "temporarily" reducing its product line and stated that the FDA "had uncovered no incidents of fraud, misrepresentation, deception or any similar unlawful acts" (id. ¶ 41).

The FDA announced on June 12, 1992 that it had filed suit against Barr in New Jersey seeking an order prohibiting Barr from manufacturing or selling pharmaceuticals. A Barr press release issued three days later reasserted its charge of retaliation by the FDA and reiterated that "no incidents of fraud, misrepresentations, deception or any similar unlawful acts" has been uncovered (id. ¶ 46).

Plaintiff's principal claim is that the defendants knew or recklessly disregarded the fact that "such statements, while possibly contributing to falling stock prices, may also have artificially delayed the decline of those prices which would have fallen more rapidly

had the statements made been more complete" (complaint ¶ 24).

Barr's stock price fell to $8½, and reached a low of $6 on June 15, 1992. The complaint alleges that the value of the stock did not fall "as far as it would have ... if defendants had told the full truth" (id. ¶ 45).

On August 24, 1992 Barr announced that the FDA was no longer seeking a total shutdown but rather was asking the court to review issues associated with specific products. Plaintiff alleges that this and other statements, financial reports and press releases made in September and November "tended to minimize the possible impact on Barr that would result from an unfavorable ruling in the lawsuit" and the "grave difficulties" facing Barr (id. ¶¶ 49, 50).

On February 4, 1993 United States District Judge Alfred M. Wolin of the District Court of New Jersey issued a preliminary injunction against Barr, ordering suspension of twenty-four products in Barr's current product line until validation studies for each were completed, and recall of twelve batches of pharmaceuticals that had released on the basis of potentially inaccurate test results or that had content uniformity and assay difficulties. *United States v. Barr Laboratories, Inc.*, 812 F.Supp. 458, 492 (D.N.J.1993). The complaint asserts that on "a full-year basis, these products represented 40% of [Barr's] sales" and that the stock price fell some 30% in value from $12.875 on February 4, 1993,

---

9. Stock prices are taken from Ex. A attached to the affidavit of plaintiff's counsel, Jan. 15, 1993, Dkt # 12, which I treat as supplementing the complaint, and from the amended complaint at ¶ 55.

the last day of the asserted class period, to $9 the next day (id. ¶¶ 54, 55).

## IV

■ Defendants assert that the complaint should be dismissed because it is not an amendment of the original complaint pursuant to Fed.R.Civ.P. 15(a), for which the court granted leave, but rather is supplemental as provided in Fed.R.Civ.P. 15(d).

Fed.R.Civ.P. 15(d) states that "... the court may ... permit a party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." As indicated in *United States v. International Business Machines Corp.*, 66 F.R.D. 223, 228 (S.D.N.Y. 1975):

> [W]here the contents of the proposed pleadings are continuations of those things originally alleged, the court believes that an amended, rather than a supplemental complaint is proper.

The plaintiff sought to amend its complaint following the decision of the District Court of New Jersey, *United States v. Barr Laboratories, Inc.*, 812 F.Supp. 458 (D.N.J.1993), while a motion to dismiss the original complaint in this case was pending. Under Rule 15(a) "... a party may amend the party's pleading only by leave of the court ... and leave shall be freely given when justice so requires". In *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), the United States Supreme Court indicated that "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, ... the leave sought should ... be freely given." See *Middle Atlantic Utilities Co. v. S.M.W. Development Corp.*, 392 F.2d 380 (2d Cir.1968).

In the present case no evidence of undue delay or improper motive has been presented.

The actions alleged include new matter and acts that occurred after the date of the original complaint but also represented a continuation of the prior course of conduct. Thus either Rule would be applicable. The distinction is hardly airtight. Inclusion of both Rule 15(a) and Rule 15(d) in Fed.R.Civ.P. 15 appears deliberately to create an overlap to avoid precisely the kind of controversy sought to be raised here. Any misnomer of the additions to the complaint as amendments rather than supplementation constitutes harmless error under Fed.R.Civ.P. 61, interpreted as called for by Fed.R.Civ.P. 1, sentence 2. I accept the pleading as an amended complaint.

## V

■ In a securities fraud suit brought pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10–b–5 promulgated under it, 17 CFR § 240.10–b–5,[10] a plaintiff must allege that, in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's actions cause him injury. *Bloor v. Carro*, 754 F.2d 57, 61 (2d Cir.1985).

Defendants maintain that plaintiff's complaint is insufficient because the relevant material information was publicly reported and reflected in the sharp fall in the stock price following public communications by the company and its officials reported in the press on November 7, 1991.[11]

■ A misrepresentation or misleading omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered

---

**10.** Rule 10–b–5 states that "it shall be unlawful for any person to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 CFR § 240.10–b–5.

**11.** Deficiencies, if any, in class issues including class representation by this particular plaintiff and the proper scope of the class period are reserved for consideration at a later time. See parts IX and XI below.

the total mix of information made available." *Basic v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988), quoting *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

▬ A party in a securities fraud action may not be held liable for failure to disclose material information unless it has a duty to disclose that information. *Chiarella v. United States,* 445 U.S. 222, 228–29, 100 S.Ct. 1108, 1114–15, 63 L.Ed.2d 348 (1980). "The materiality of the information claimed not to have been disclosed ... is not enough to make out a sustainable claim of securities fraud. Even if information is material, there is no liability under Rule 10b–5 unless there is a duty to disclose it." *Glazer v. Formica Corp.,* 964 F.2d 149 (2d Cir.1992), quoting *Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir.1990).

▬ Where a defendant has knowledge about the underlying facts sufficient to require disclosure of concrete material information, a duty of disclosure may arise. Opinions or expectations about events in the future which are not "strictly factual" are only required to be disclosed under Rule 10b–5 "when the defendant disseminated the forecasts knowing they were false or that the method of preparation was so egregious as to render their dissemination reckless." *Robbins v. Moore Medical Corp.,* 788 F.Supp. 179, 184 (S.D.N.Y.1992), quoting *Estate of Detwiler v. Offenbecher,* 728 F.Supp. 103, 137 (S.D.N.Y.1989). "Liability probably should not be imposed on the basis of words that 'bespeak caution'." *Goldman v. Belden,* 754 F.2d 1059, 1068 (2d Cir.1985), quoting *Polin v. Conductron Corp.,* 552 F.2d 797, 806 n. 28 (8th Cir), *cert. denied* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977); see *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986).

Nor is it necessary to disclose information already well known to the public. Under the efficient market theory such news is incorporated quickly into the stock price. See *Basic v. Levinson,* 485 U.S. 224, 241–245, 108 S.Ct. 978, 988–90, 99 L.Ed.2d 194 (1988); *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 510 (7th Cir.1989).[12]

▬ Disclosure of information about the future of a company can be divided into two types. There are affirmative disclosures of material information which a company must make and there are those projections or thoughts of management which are speculative and which are not required to be disclosed unless they are "reasonably likely" to happen. 17 CFR § 240.103. This does not mean that a known hazard can be withheld from users of products or investors in their makers.

▬ The Court in *Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), pointedly declined to rule that speculative evaluations of future events or problems the extent of which were still shrouded in uncertainty had to be disclosed to the public on pain of legal sanctions. Statements of this type could themselves be misleading and cause as much harm as their absence. To require such a Hobson's choice would make the securities laws a barrier to the underlying economic activity the securities markets themselves seek to promote and on which they are in the end entirely dependent.

The practicality of disclosure is closely related to the need for sufficiently definite information which could be meaningful when offered to the investing public. Where statements involve opinion or guessing or estimates, there may not be a duty of disclosure.

In declining to dismiss the complaint, I do not imply that plaintiff's claims can necessarily survive at the summary judgment or trial

---

12. Efficient market theory seems applicable to this case because the fact that the FDA was investigating Barr was known to the investing public and did not require sophisticated understanding or in depth information by an investor. Consequently the market can be expected to have absorbed the information and reflect any impact in the company's selling price. This is in contrast with a situation where large expenditures made for research and development reduce a quarterly income statement and hence appear to the novice investor like a negative number, when in fact, the results will pay off with a large contribution to the profit line in the future (i.e., oil exploration where probability of success is known to those who have detailed knowledge of the field). See Special Report, "Is the Financial System Shortsighted? A Lack of 'Patent' Capital Could Play Havoc With Long–Term Growth," Bus. Wk., Mar 3, 1986 at 33.

stage. Where such risks are already known to the public, further disclosure becomes irrelevant, and requiring it meaningless. In this instance, by the end of November 1991, the media had already reported a major scandal in the generic drug industry, relating to improper testing procedures and coverups of such impropriety and specific allegations against Barr had been made public through the press and by Barr itself.

I sustain plaintiff's complaint because of Barr's affirmative comforting statements, not independent nondisclosure. The extent of damage resulting, if any, cannot be determined in this case at the complaint stage.

## VI

Affirmative statements of facts, unlike statements of opinion or forecasts, represent an action deliberately taken to create an impression. Plaintiff claims liability based on one-sided statements, which might have created a pattern of deception because of comforting statements made in response to information which was already public.

■ When a securities issuer does make a disclosure, whether or not it has the duty to make the disclosure in the first place, it must be reasonably complete and must be accurate. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860–61 (2d Cir.1968), *cert. denied* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26 (1st Cir.1987); *Robbins v. Moore Medical*, 788 F.Supp. 179, 184 (S.D.N.Y.1992).

■ Plaintiff asserts that on three separate occasions between October 24, 1991 and June 15, 1992 Barr and/or the individual defendants stated in press releases that the FDA's inspections had "uncovered no incidents of fraud, misrepresentation, deception or any similar unlawful acts." [13] It cannot be said at this time that Barr did not know of any facts that would or could be revealed that might render this affirmative statement deceptive. A calming statement of this nature may ultimately prove to have been misleading under federal securities law.

Other affirmative statements minimizing the extent and potential impact of the investigation and resting on facts that were or should have been within the control of the defendants, include comments that an alleged retaliatory motive by the FDA was the basis for the investigation (e.g., complaint ¶ 30, 46), that the investigation was based on a "whole series of very technical issues" relating to Current Good Manufacturing Practices (id. ¶ 34), and that Barr's products "are in strict conformance with all applicable pharmaceutical industry standards" (id. ¶ 46).

The meaning of these comments to the average investor, their truth or falsity, and their completeness as well as their possible effect on the financial stability of Barr, if any, cannot be determined from the complaint alone. The likelihood that products or batches of products did in fact fail to comply with requirements intending to insure safety and efficacy, and the potential effect of court-ordered injunctive relief for the FDA on the financial condition of Barr, are issues that can only be addressed at a later stage.

## VII

Courts seek to protect the business community against risks of being placed in an impossible bind where any statement or even silence may be deemed to be a violation of federal securities laws. This problem requires particular vigilance because class action suits are encouraged by the fee-shifting aspect where a fund is created out of which damages to the plaintiffs, if proven, and fees to attorneys may be paid, see e.g., *Feuerstein v. Burns,* 569 F.Supp. 268, 271 (S.D.Cal. 1983). This promotes the legitimate function of plaintiffs and their counsel as private attorneys general but also requires care to insure that this powerful tool is not abused.

In this case the complaint sweeps with a wide brush and contains numerous allegations, many of which are conclusory. Facts, not conclusions are the essence of a complaint and provide the basis upon which it can be upheld. See *Volvo North America Corp. v. Men's International Tennis Coun-*

---

**13.** The basis for the use of this particular language on at least three occasions should be clari-

fied at the summary judgment stage of this litigation.

*cil,* 857 F.2d 55 (2d Cir.1988); Marcus, *The Revival of Fact Pleading Under the Federal Rules of Civil Procedure,* 86 Colum L Rev 433 (1986).

 Accepting the factual allegations in the complaint as true for purposes of determining this motion to dismiss, *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969), I reject the plaintiff's assertion that Barr had a generalized obligation to disclose their own developing evaluation of their problems as time went by and I decline to accept the notion that there was an affirmative obligation to disclose information where substantial press coverage existed. I do recognize, however, that once affirmative comforting statements are made, the failure to complete the picture could be misleading. The affirmative statements noted above are sufficiently concrete standing alone to support a claim under federal securities laws.[14]

### VIII

Although I find only some of the defendants' alleged statements or omissions by themselves potentially misleading, it is impossible to determine before discovery has begun what time period any associated course of conduct might or might not cover. It is also unclear whether other events not independently actionable may combine with those for which Barr may be liable to justify finding a pattern of conduct covering a longer period. To ignore this possibility would require me to split a factual pattern into airtight compartments contrary to what may be the reality. See *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 707, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). It is hazardous to engage in "disaggregation" of events, see Tushnet, "Book Review," 82 Colum L Rev 1531, 1536–39 (1982), and I decline to undertake detailed dissection of the complaint at this juncture. See *In re Ames Dep't Stores, Inc. Stock Litigation (Steiner v. Ames Dep't Stores, Inc.),* 991 F.2d 953, 968 (2d Cir.1993).

**14.** The statements quoted in the complaint are accepted as verbatim quotations of the defen-

Occurrences before or after periods covered by a complaint can frequently be considered in evaluating an entire course of conduct. See *Local Lodge 1424 v. NLRB,* 362 U.S. 411, 416, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960); *Eatz v. DME Unit of Local Union No. 3,* 794 F.2d 29 (2d Cir.1986).

Whether the plaintiff has standing to assert class claims because he purchased his shares on November 11, 1991 cannot be determined at this early stage of the litigation. See *Robbins v. Moore Medical Corp.,* 788 F.Supp. 179, 186–188 (S.D.N.Y.1992).

### IX

In all other respects the defendants' other arguments, including those relating to controlling person liability under Section 20 of the Exchange Act, 15 U.S.C. § 78t, and the specificity requirements of Fed.R.Civ.P. 9(b) do not justify dismissal of the complaint as to any or all of the defendants at the present time.

### X

It remains to be seen whether the plaintiff can prove his allegations. Among the several aspects still unclear are:

(a) whether or not any statements other than the allegedly incomplete comfort statements are actionable as part of an overall pattern;

(b) which investors, if any, may be able to show potential injury if the time period were to be limited on the basis that only the incomplete comfort statements are actionable;

(c) whether a substantial delay in the decline of the stock price is attributable to any incomplete or misleading statement; and

(d) whether any of these events caused any significant injury to any shareholder.

In sum, it cannot now be foreseen whether evidence can be shown sufficient to permit a factfinder to conclude that there is liability or damage. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265

dants.

(1986). The boundaries of what is to be considered at trial may be delineated after decision on motions for summary judgment under Fed.R.Civ.P. 56 by the parties or as may be required by the court under *Celotex*, 477 U.S. at 326, 106 S.Ct. at 2554,[15] or through a pretrial order under Fed.R.Civ.P. 16, see *Jacobson v. Cohen*, 151 F.R.D. 526 (S.D.N.Y.1993).

## XI

The present stay on discovery pending my determination of the motion to dismiss is lifted. I refer this case to United States Magistrate Judge Mark D. Fox for all pretrial purposes, except that dispositive motions are to be made to me initially.

**SO ORDERED.**

---

**15.** *Celotex* indicates that the court may require on its own motion a showing that the party with the burden of proof come forward and establish that a genuine issue of material fact with respect to each of its contentions exists: "... [D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice [to] come forward with all of [the party's] evidence." 477 U.S. at 326, 106 S.Ct. at 2554.